875 F.2d 868
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Nathan Perkins ROBINSON, Defendant-Appellant.
 No. 88-1165.
 United States Court of Appeals, Sixth Circuit.
 May 19, 1989.
 
 Before WELLFORD and RALPH B. GUY, Jr., Circuit Judges and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant, Nathan Robinson, appeals his conviction on two counts of wire fraud. 18 U.S.C. Sec. 1343. On appeal, Robinson raises four issues: (1) evidence used against him was the result of an illegal search and should have been suppressed; (2) defendant did not receive effective assistance of counsel; (3) the evidence was insufficient to sustain a guilty verdict; and (4) the prosecution made improper remarks in his closing argument.
 
 
 2
 Upon review, we find no errors requiring reversal and will affirm the convictions.
 
 I.
 
 3
 On May 13, 1987, Mrs. Mary Haas, a widow living in Three Oaks, Michigan, received a telephone call from a person who identified himself as a Catholic priest. Mrs. Haas was recently widowed and her husband's obituary had been in several local papers one month earlier. She had recently received life insurance proceeds generated by her husband's death. The caller indicated that Mrs. Haas' son, George, was in jail and needed $1,500 in bail money. Mrs. Haas was instructed to go to Western Union and wire $1,500 to a Katherine Fleming who was identified as George's attorney. The call was a hoax and the jury ultimately determined the caller to be defendant Robinson. Fleming was not an attorney, but a recent acquaintance of Robinson who agreed to help him defraud Mrs. Haas by going to Western Union claiming the money Mrs. Haas wired. Fleming received $100 for her assistance.
 
 
 4
 Two days later on May 15, 1987, Frederick Hoodwin, in Michigan City, Indiana, received a similar call. Again Robinson, posing as a priest, informed Hoodwin that his nephew was in jail and needed bail money. Hoodwin, taken in by the hoax, wired $2,000. The nephew was not in jail, but his name had recently been in the newspapers as a result of an engagement notice. The money was to be wired to James Jeffrey, an unwitting accomplice of Robinson's. Jeffrey was a maintenance man at the Park West Motel in Kalamazoo, Michigan. Robinson and his partner in this scheme to defraud, James Ellis, were staying at the motel. Robinson and Ellis convinced Jeffrey that they had lost all their money and identification as a result of a car break in. Jeffrey agreed to use his identification to pick up the money being wired by Hoodwin. Jeffrey picked up the check and cashed it and gave the money to Robinson and Ellis who then gave him $120. Jeffrey became suspicious, however, and called Hoodwin. As soon as Hoodwin began talking about his nephew and bail money, Jeffrey hung up and called the Kalamazoo Police Department. Jeffrey, after telling the police what occurred, gave the police a full description of Robinson and Ellis, their vehicle and the direction in which they were travelling. Later that afternoon, Kalamazoo police stopped a vehicle that matched the description. The occupants of the vehicle also fit the description given by Jeffrey.
 
 
 5
 When the police stopped the car, the driver identified himself as James Ellis and produced identification. Robinson, the passenger, identified himself as "David Williams" but was unable to produce any identification. He did give a birthdate of February 20, 1952. The police instituted a computer search under the name of "David Williams" with a February 20, 1952, birthdate. "Williams" told the police his identification was in a house four blocks away. The police went with "Williams" to the house, but there was no identification there. "Williams" next told the police his identification was in a drug house down the street but it was too dangerous to go there. About this time, the computer search revealed an outstanding warrant for a "David Williams" with a birthdate of February 11, 1952. "Williams" (Robinson) was arrested at this time. A search incident to the arrest turned up $938.71 in cash of which $800 was found in Robinson's shoe.
 
 
 6
 Two days later, on May 17, 1987, Robinson admitted to the police his true identity, and indicated the money he had when arrested came from a sale of cocaine to Jeffrey.
 
 II.
 
 7
 Defendant argues that the money seized upon his arrest should not have been used as evidence because it resulted from an illegal search.[1] We disagree. Defendant devotes a considerable portion of his argument on this issue to the law of probable cause as it relates to information received from informants--equating Jeffrey with an informant. The law defendant cites is inapposite. The information the police received from Jeffrey was first hand from an individual directly involved in the alleged criminal transaction. Indeed, Jeffrey is arguably one of the victims of the crime. He had ample opportunity to be with and observe the defendants and their automobile only minutes before he made his report to the police. When a victim reports a crime to the police, the case law on informant reliability simply is not implicated. Based on the description given by Jeffrey, the police had ample justification for stopping the car. When Robinson could produce no identification himself and then took the police on a wild goose chase seeking his "David Williams" identification, he gave the police reasonable suspicion for further investigation. When the computer turned up an outstanding warrant for "David Williams," the police, against this backdrop, had probable cause to arrest notwithstanding the minor descrepancy in the birthdate.
 
 
 8
 We also note that Katherine Fleming[2] and James Jeffrey both testified at trial. Given the damaging nature of their testimony, the introduction of cash found on the person of Robinson at the time of his arrest was hardly the key piece of evidence in the prosecution's case.
 
 
 9
 Finding probable cause for the arrest, we find that those items seized in the search pursuant to the arrest were properly admitted into evidence.
 
 III.
 
 10
 Our resolution of the search issue also resolves the ineffective assistance of counsel issue, since the only ineffectiveness alleged is trial counsel's failure to seek a suppression hearing. As the Supreme Court stated:
 
 
 11
 Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.
 
 
 12
 Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).
 
 
 13
 Since there was no merit to defendant's probable cause issue, he could not have been prejudiced by counsel's failure to raise it. Without prejudice there can be no ineffective assistance of counsel. Strickland v. Washington, 466 U.S. 668 (1984).
 
 IV.
 
 14
 We need spend little time on the sufficiency of the evidence question. Our standard of review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Here, the government was able to produce the victims of the crime, the "unwitting" accomplices, and the police to whom false exculpatory statements were made. The jury had a full picture of what occurred and Robinson's role in the scheme. It is hard to conceive of how any rational trier of fact could have arrived at any verdict other than guilty.
 
 V.
 
 15
 The last issue we address is the claim of improper closing argument by the prosecution. The prosecutor argued, inter alia, that "the defendant, whom he alternately characterized as a 'con man,' a 'thief,' and a 'bad guy,' went 'from one city to the next stealing ... widow's death benefits,' and that as a result, this jury now had the opportunity 'to come back in here and look at each one of those defendants and say, "No way. Not in this district you don't." ' " (Defendant's brief at 40).
 
 
 16
 Although we find some merit to defendant's argument, we do not find the kind of prejudice that would require reversal. The prosecution's closing argument was not a model of propriety. In truth, however, it was probably less effective than it would have been if the prosecutor had stuck to the facts. This was a strong case with much direct evidence. Under such circumstances the "poor widow, name calling, and crime spree" arguments were unnecessary and inappropriate and we voice our disapproval. However, we do not believe the arguments were outcome determinative, and in this setting were not the type to inflame the passions of the jury or cloud its judgment.
 
 
 17
 AFFIRMED.
 
 
 
 [1]
 Although this issue was not raised below, we discuss it because of its interrelationship with the ineffective assistance of counsel issue
 
 
 [2]
 Mary Fleming, Katherine's sister, also testified at trial. Mary was the individual who first met Robinson and Ellis. She introduced them to her sister Katherine because Katherine had a telephone, which they used to make the call to Mrs. Haas